# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 24-09-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER |
| SAM DEAN GLENN, | |
| Defendant. | |

Before the Court is Defendant Sam Dean Glenn's Motion to Suppress. (Doc. 19). Glenn is charged with being a prohibited person in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Glenn seeks to suppress the firearm, magazine, and ammunition seized by Billings Police officers on November 23, 2023, as well as all the fruits of the seizure and search. (Doc. 19 at 2). The Government responded (Doc. 23), and Glenn replied (Doc. 24). Neither party requested a hearing. The Court has reviewed the exhibits submitted by Glenn, consisting of the reports of the responding officers (Doc. 20-1), the 911 dispatch log (Doc. 20-2), an aerial photo of the location where officers stopped Glenn (Doc. 20-

1

3), Officer Shreeve's body cam footage (Doc. 18-1), and the recording of the 911 call (Doc. 18-2). The parties do not dispute the correctness of these exhibits, and there are no disputes of fact for the Court to resolve. As such, the Court concludes that the matter can be resolved without a hearing. *See United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) ("An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist.").

For the following reasons, the Court grants Glenn's motion.

## I.   Background Facts

On November 23, 2023, Billings City/County 911 Center received a call reporting "a guy . . . in a black hoodie and blue jeans . . . flashing a gun around" in front of a house on South 28th Street. (Doc. 18-2 at 0:16–0:23). The man was later identified as Glenn. (Doc. 20-1 at 7). The caller described the man as about 5'8", Native American, in his mid-to-late-20's, and of medium build. (Doc. 18-2 at 1:05–1:25). The caller later reported to police that the man was speaking to a woman (Doc. 20-1 at 9), but then he started "talking to some guy on a bicycle" (Doc. 18-2 at 1:55–2:00; Doc. 20-1 at 9). According to the caller, the man "flash[ed] a black semi-automatic handgun," then "stuck it back in his pants." (Doc. 18-2 at 2:10–

2:17). The caller did not report to dispatch whether the man "flash[ed]" the handgun in the presence of either the woman or the man on the bicycle, though in a later interview, the caller said the man in question was speaking to the woman while "waiving" the gun. (Doc. 20-1 at 9). The caller did not report how the woman or the man on the bicycle responded to the man, though he did say that "it would be really nice if they could catch him before he gets back inside." (Doc. 18-2 at 2:26–2:29). The caller provided his name, address, and phone number. (*Id.* at 0:12–0:15, 0:42–0:43).

Officers Shreeve and Beechie arrived at the house identified by the caller and walked with guns drawn toward two men standing on the sidewalk. (Doc. 18-1 at 1:09–1:11; Doc. 20-1 at 7). The officers ordered the men to show their hands and asked if either man had any weapons. (Doc. 20-1 at 7). Glenn stated that he had a weapon and, motioning with his head to the pocket on the front of his sweatshirt, said, "right there, in the pocket." (*Id.*; Doc. 18-1 at 1:18–1:22). Police told him to "show his hands please," to which Glenn replied, with his hands still in the air, "Yep, yep, do your things." (Doc. 18-1 at 1:22–1:26). In response to the officer's question as to where the gun was, Glenn replied, "under the sweater." (*Id.* at 1:25–1:29). Officer Shreeve removed the gun from the waistband of Glenn's jeans. (*Id.* at 1:31–1:32). Officer Beechie then handcuffed Glenn, while Officer Shreeve said to the

man on the bicycle, later identified as Randolph Powers, "You, sir? No weapons? Promise? No other weapons, man? Nothing? Knives, guns, grenades?" (*Id.* at 1:36–1:46). Powers repeatedly answered in the negative or shook his head. (*Id.*). Officer Shreeve said, presumably to Glenn, "Somebody called and said you were waving this around. What's over there?" (*Id.* at 1:46–1:48). Glenn said, "Oh, the . . .", and Officer Shreeve said, "the magazine?" (*Id.* at 1:49–1:50). Glenn said, "Yeah." (*Id.* at 1:52). Officer Shreeve took the magazine from Glenn's front pocket. (Doc. 20-1 at 7). He said to Glenn, "We just have to check because this isn't cool." (Doc. 18-1 at 2:07–2:10). "What's the story?" Officer Shreeve asked Glenn, to which Glenn replied, "There's no story with it." (*Id.* at 2:12–2:17). When Officer Beechie asked Glenn if he had any other weapons and patted the pockets of Glenn's jeans and sweatshirt, Glenn shook his head. (*Id.* at 2:19–2:25). Powers lifted his shirt, presumably to show the officers he did not have any weapons. (*Id.* at 2:33). Officer Beechie placed Glenn in the backseat of the patrol car. (Doc. 20-1 at 7). After checking the identification of Powers, the officers told Powers that he could leave the area. (Doc. 20-1 at 7; *see* Doc. 18-1 at 3:30–3:31).

At some point in time after being handcuffed, Glenn told an officer that he was on probation. (Doc. 20-1 at 7). Officer Beechie contacted Probation Officer Ledger, who requested that Glenn be remanded to Yellowstone County Detention

Facility on a hold. (*Id.*). Officer Beechie transported Glenn to Yellowstone County Detention Facility and forwarded the case to the Bureau of Alcohol, Tobacco, and Firearms for review and possible charging. (*Id.*).

On January 18, 2024, Glenn was charged with being a prohibited person in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). (Doc. 3).

## II.   Legal Standard

In *Terry v. Ohio*, the Supreme Court held that the Fourth Amendment permits an investigatory stop and frisk. 392 U.S. 1, 30 (1968). Police may conduct a lawful investigatory stop when "the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). An encounter may proceed from a stop to a frisk when the police officer "reasonably suspect[s] that the person stopped is armed and dangerous." *Id.* at 326–27; *see also Liberal v. Estrada*, 632 F.3d 1064, 1079 (9th Cir. 2011) (explaining that, as the officers did not have reasonable suspicion to stop the suspect, the ensuing frisk was unreasonable), *overruled on other grounds by Hampton v. California*, 83 F.4th 754 (9th Cir. 2023). The "reasonable suspicion" standard requires that the officer must be able to articulate a "minimal level of

objective justification," but the standard is "considerably lower than a preponderance of the evidence[.]" *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

To conduct a lawful investigatory stop, the officer must have a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). Officers are allowed to draw common-sense inferences from the observed behavior to develop reasonable suspicion. *See id.* at 277. The Government has the burden of providing "specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct" to justify reasonable suspicion. *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (internal citation and quotation marks omitted).

The Court assesses the totality of the circumstances surrounding the stop to determine whether an officer possessed reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). The Court evaluates the totality of circumstances objectively and disregards an officer's subjectivity. *United States v. Willis*, 431 F.3d 709, 716 (9th Cir. 2005). Circumstances that may contribute to a finding of reasonable suspicion include furtive behavior, *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984); activity in high crime areas, *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000); "unprovoked flight" from police, *Wardlow*, 528 U.S. at

6

125; and evasive movements, *Sokolow*, 490 U.S. at 8. The Supreme Court has cautioned that the "totality of the circumstances" standard imposed by *Terry* and its progeny makes a bright-line test difficult to impose but recognized that "the factual 'mosaic' analyzed for a reasonable-suspicion determination" may be useful in comparing cases. *Arvizu*, 534 U.S. at 275.

If law enforcement violates a defendant's Fourth Amendment right to be free from unreasonable searches and seizures, then, under the exclusionary rule, "all evidence seized as a result of the unconstitutional actions of law enforcement must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

## III. Analysis

The Government concedes that the stop in question was a *Terry* stop (*see* Doc. 23 at 9–10), which the Court accepts without deciding. The threshold question is whether officers possessed reasonable suspicion to conduct the investigatory stop of Glenn. *See Johnson*, 555 U.S. at 326. If the officers possessed reasonable suspicion to conduct the initial stop, the next question is whether the officers possessed reasonable suspicion that Glenn was armed and dangerous to conduct the frisk of Glenn. *See id.* at 326–27.

7

### A.   Terry *Stop*

Glenn first argues that the Government did not point to "specific and articulable facts" that warranted the officers' initial stop of Glenn. (Doc. 20 at 15 (quoting *Terry*, 392 U.S. at 21)). Glenn asserts that he was not exhibiting suspicious behavior. (*Id.* at 16). Glenn argues that the caller reported a man "flashing" his gun but did not give any "indication of what the suspect was doing with a firearm in relation to any other people." (*Id.* at 17).

In response, the Government argues that the caller's report that Glenn was "flashing a gun in the presence of another male in a high crime residential area" provided the officers with reasonable suspicion to stop Glenn. (Doc. 23 at 5). The Government further asserts that the caller identified himself, provided accurate descriptions of Glenn and the gun, and stayed on the call until police arrived. (*Id.* at 5–6). The Government argues that Glenn might have been engaging in one or more public safety violations, namely negligent endangerment (Mont. Code Ann. § 45-5-208); criminal endangerment (§ 45-5-207); disorderly conduct (§ 45-8-101); or assault with a weapon (§ 45-5-201). (*Id.* at 6 n.2). The Government next argues that, while carrying a concealed weapon may be legal in Montana, the "possibility of innocent conduct" does not negate reasonable suspicion. (*Id.* at 7 (quoting *Navarette v. California*, 572 U.S. 393, 403 (2014))). While acknowledging that the

Ninth Circuit has found that possession of a gun itself does not demonstrate reasonable suspicion, the Government asserts that, when a suspect is engaged in bizarre conduct or in a high crime area, police have reasonable suspicion that a suspect could be a danger to himself or others. (*Id.* at 8–9 (first citing *United States v. Brown*, 925 F.3d 1150, 1154 (9th Cir. 2019), then citing *United States v. Willy*, 40 F.4th 1074, 1089–90 (9th Cir. 2022))).

On reply, Glenn argues that the dispatcher and officers did not elicit or learn information that supported a reasonable suspicion of criminal activity. (Doc. 24 at 1). First, Glenn argues that officers did not clarify what "flashing" the gun meant, and the information provided by dispatch did not provide officers with reasonable suspicion to stop him. (*Id.* at 2). Second, he asserts there was no evidence that he engaged in any kind of suspicious or unsafe behavior. (*Id.*). Third, he argues that Ninth Circuit precedent demands that the Court must scrutinize the Government's description of the neighborhood as "high crime." (*Id.* at 3). Finally, he argues that the Government fails to provide details to support "'a particularized and objective basis for suspecting the particular person' ... was breaking the law." (*Id.* at 4 (quoting *Navarette*, 572 U.S. at 396)).

As an initial matter, the Court finds that police could reasonably rely on the information provided by the 911 caller.

An officer may form reasonable suspicion from their own observations, as well as from information provided by callers. *See Navarette*, 572 U.S. at 397–98. For police to rely on a tip from a caller, the information must "carry sufficient indicia of reliability *prior* to the *Terry* stop to justify reliance on it." *United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004) (emphasis in original). Factors to consider in assessing reliability include whether the tip was anonymous, *Florida v. J.L.*, 529 U.S. 266, 270–272 (2000); whether the caller phoned 911 or the police directly, *Terry-Crespo*, 356 F.3d at 1176 (finding a 911 call entitled to greater reliability than a direct call to the police); and whether the caller provided "first-hand information from a crime victim laboring under the stress of recent excitement," *id.*

Here, the caller identified himself, provided contact information to the dispatcher, and met with an officer following the police interaction with Glenn. (*See* Doc. 20-1 at 9). The caller provided detailed information of what Glenn looked like and reported that Glenn "flash[ed]" a gun and then placed the gun in his waistband. The caller's tips were likely reliable and were later corroborated by the officers.

However, the information provided by the caller was insufficient on its own for the police to have reasonable suspicion to conduct an investigatory stop. Based on the content of the call, the officers knew that Glenn was in possession of a gun. Openly carrying firearms and carrying concealed firearms are presumptively legal

10

in Montana. *See* Mont. Code Ann. §§ 45-8-328, 316(3).[1] When the caller reported

that Glenn "flash[ed]" a gun and put it in his waistband, he was not reporting a crime

or criminal activity. *Cf. United States v. Vasquez*, No. 22-30074, 2023 WL 2985129,

at *1 (9th Cir. Apr. 18, 2023) (finding the officer had reasonable suspicion to detain

a defendant for a brief investigative stop when the defendant carried a gun and

engaged in behavior that was "possibly indicative of . . . intoxication" in violation

of Montana Code Annotated § 45-8-327). When state law "permits individuals to

openly carry firearms, the exercise of this right, *without more*, cannot justify an

investigatory detention." *United States v. Black*, 707 F.3d 531 (4th Cir. 2013)

(emphasis added); *see also United States v. King*, 990 F.2d 1552, 1559 (10th Cir.

1993) (explaining that allowing police to seize any armed citizen "whom the officers

---

1. The Montana legislature has removed almost all strictures on the concealment of firearms by nearly any individual. H.B. 102, 67th Leg., Reg. Sess. (Mont. 2021) (effective Feb. 19, 2021) (codified as amended in scattered sections of Montana Code Annotated § 45, Part 3). The bill, among other things, eliminated nearly all the previous circumstances and locations where a concealed weapon could be properly prohibited. H.B. 102, §§ 4-10. The legislature defined its purpose and intent as follows:

> Section 1. Purpose. The purpose of [H.B. 102] is to enhance the safety of people by expanding their legal ability to provide for their own defense by reducing or eliminating government-mandated places where only criminals are armed and where citizens are prevented from exercising their fundamental right to defend themselves and others"
> Section 2. Legislative intent. It is the intent of the legislature to reduce or remove provisions of law that limit or prohibit the ability of citizens to defend themselves by restricting with prior intent the right to keep or bear arms.

H.B. 102, §§ 1–2.

have any articulable reason to believe presents a threat" to the officers' safety would "effectively eliminate Fourth Amendment protections for lawfully armed persons.").

Having established that the tip alone was insufficient, the Court now looks at whether officers observed something "more" that would provide them with reasonable suspicion to stop Glenn. The officers did not report making any observations when they approached Glenn, and the officers' body cam footage does not show Glenn acting suspiciously. In fact, Glenn was compliant, told the officers about his gun, and obeyed each of the officers' instructions.

The Government claims that more exists: the immediate area in which Glenn was stopped was a "high crime area" (Doc. 23 at 5–6), and the officers could have reasonably suspected that Glenn was in violation of Montana law, specifically § 45-5-208(1) (negligent endangerment), § 45-5-207 (criminal endangerment); § 45-8-101 (disorderly conduct), or § 45-5-201 (assault) (*id.* at 6 n.2).

As to the Government's "high crime area" argument, the Government has not provided testimony or evidence that this area of South 28th Street is a high crime area, so the Court will not consider that unsupported assertion. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("The citing of an area as 'high-crime' requires careful examination by the court, because such a description,

unless properly limited and factually based, can easily serve as a proxy for race or ethnicity.").

As to the Government's argument that the officers could have had reasonable suspicion that Glenn was in violation of Montana law, the Court finds that the Government cannot provide post hoc justifications in its brief to rationalize the actions of an officer. *See Terry*, 392 U.S. at 21 ("[I]n justifying the particular intrusion the *police officer* must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.") (emphasis added); *see also United States v. Foster*, 634 F.3d 243, 249 (4th Cir. 2011) ([T]he Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband."). Neither Officer Beechie nor Officer Shreeve reported that they thought Glenn was violating the law, much less violating a specific statute, nor did they articulate facts that would lead the Court to find that the officers suspected Glenn was engaging in criminal activity. (*See* Doc. 21-1 at 7–8). The Court recognizes that police are often called upon to make very difficult decisions about when to conduct *Terry* stops, but the Fourth Amendment requires that officers be able to articulate specific facts that provided them with reasonable suspicion that "the person apprehended is committing or has

13

committed a criminal offense." *See Johnson*, 555 U.S. at 326. The officers failed to do so in this case.

The Court finds its conclusion supported by the Ninth Circuit's opinion in *United States v. Brown*, 925 F.3d 1150 (9th Cir. 2019). In that case, a YWCA employee called 911 and reported that a YWCA resident had seen a young, black man carrying a gun. *Id.* at 1152. The caller described the man as being of medium build with dreadlocks and wearing a camouflage jacket and red shoes. *Id.* The caller had not seen the man or the gun herself. *Id.* The responding officers saw a man, later identified as Brown, who matched the caller's description. *Id.* Upon seeing the patrol car lights, Brown ran for a block before the officers caught him and ordered him to the ground at gunpoint. *Id.* The officers handcuffed Brown and found a gun in his waistband, as well as drugs and cash on his person. *Id.* at 1152–53.

The Ninth Circuit found the totality of the circumstances insufficient to justify the *Terry* stop, as there were not "facts indicating criminal activity or a known high crime area." *Id.* at 1153. First, the court considered that the source of the tip was anonymous and did not provide "any predictive information that might have served as an indicia of reliability." *Id.* Second, the court found that police had no initiative to investigate a particular crime in a high crime area. *Id.* at 1153. The court noted

that it is "presumptively lawful to carry a gun" in Washington, and that carrying a gun without a concealed carry permit is "simply a civil infraction." *Id.* at 1154. The tip that Brown had a gun therefore "created at most a very weak inference that he was unlawfully carrying the gun without a license, and certainly not enough to alone support a *Terry* stop." *Id.* Finally, the Court found that, within the context of the circumstances, Brown's flight was "not tantamount to guilt." *Id.* at 1157.

The Court finds *Brown* and this case analagous. Here, a caller reported a person of color "flashing" a gun. The caller accurately described the man, and police were able to quickly locate him. In both cases, the police did not allege that they were investigating in a high crime area. Importantly, like in *Brown*, it is "presumptively lawful" to both openly carry a firearm and conceal carry a firearm in Montana, so a report of Glenn holding a gun "created at most a weak inference that he was unlawfully carrying the gun without a license[.]" *Id.* at 1154. While the tipster in *Brown* was anonymous, in this case, the tipster was reliable. However, the Court notes that, unlike in *Brown*, when police confronted Glenn, he did not run, but complied with their requests. Finally, in both cases, the callers' reports of a person carrying a firearm is insufficient on its own to justify reasonable suspicion. Based on *Brown*, the Court finds no reasonable suspicion to justify the officer's *Terry* stop of Glenn.

The Government compares this case to *Willy*, but the Court is unpersuaded by *Willy*'s holding. (Doc. 23 at 8–9 (citing 40 F.4th at 1089–90)). In that case, an officer responded to two calls about a man displaying his gun while reporting that he had been kidnapped and held in the area, and that he was "trying to find the place where he was kept." *Willy*, 40 F.4th at 1077–78. One caller reported the man racking his gun. *Id.* at 1077. Concerned that Willy was a danger to himself and others and convinced Willy was violating Washington law, the officer arrested him. *Id.* at 1080. The Ninth Circuit found that, as it is presumptively legal to carry a firearm in Washington, "the bare fact that Willy displayed a weapon would not be sufficient to stop Willy." *Id.* The court found that the officer did not have probable cause to arrest Willy, but that the officer should have "conducted a *Terry* stop to see whether Willy posed a potential threat to Willy's own safety, [the officer's] safety, or the safety of others." *Id.* at 1089.

The Court finds *Willy* inapposite here. First, because the question considered by the *Willy* court was whether the officer had probable cause to arrest Willy, *see id.* at 1077, the Court hesitates to apply the dicta that the officer in *Willy* had reasonable suspicion based on Willy's conduct. Second, the callers in *Willy* described their first-hand interactions with Willy, including their conversations. *See id.* at 1078. The caller in this case did not speak to Glenn and only reported seeing Glenn

16

"flash[]" a gun. Finally, the callers in *Willy* described "bizarre" behavior and Willy racking his gun, supplying a fact beyond presumptively legal gun possession to provide officers with reasonable suspicion to stop Willy. *See* 40 F.4th at 1090 (Christen, J., dissenting) (describing Willy's behavior as "bizarre"); *Black*, 707 F.3d at 540. Beyond his report of the firearm, the caller in this case only described Glenn speaking with a woman and a man on a bicycle, which the Court would not describe as bizarre behavior. At no time did the caller say Glenn pointed the gun at either the woman or the man or that the woman or the man fled from Glen under some apparent threat.

Accordingly, the Court finds that Officers Shreeve and Beechie did not have reasonable suspicion under *Terry* to conduct an investigative stop of Glenn. Because the initial stop was unconstitutional, the Court does not reach the question of whether the frisk was constitutional.

B.    *Exclusionary Rule*

"The [exclusionary] rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect[.]" *United States v. Calandra*, 414 U.S. 338, 348 (1974). The rule has "traditionally been driven by one primary policy consideration: the deterrence of unconstitutional acts by law enforcement." *United States v. Jobe*, 933 F.3d 1074, 1078 (9th Cir. 2019); *see also*

17

*Arizona v. Evans*, 514 U.S. 1, 11 (1995) ("[T]he exclusionary rule was historically designed to deter police misconduct[.]") (internal quotation marks and citations omitted).  "The exclusionary rule applies both to direct and indirect products of an illegal search."  *United States v. Manrique-Frias*, ___F. Supp.3d___, 2023 WL 6119714, at *8 (D. Mont. Sep. 18, 2023).

The Court finds suppression of the firearm, magazine, and ammunition seized from Glenn by Billings Police Officers on November 23, 2023, as well as all the fruits of the seizure and search, is warranted to deter future illegal searches and seizures by the police.  *See Wong Sun*, 371 U.S. at 484–85.

## IV.   Conclusion

Accordingly, Glenn's Motion to Suppress (Doc. 19) is GRANTED, and all evidence obtained as a result of the stop and frisk is suppressed.

DATED the 20th day of May, 2024.

Susan P. Watters

SUSAN P. WATTERS
UNITED STATES DISTRICT JUDGE